# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 1157 | **DATE** | 9/30/02 |
| **CASE TITLE** | | USA vs. Sheila Matthews | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, the government's motion for upward departure is granted in part and denied in part. The Court will sentence Matthews within the range that applies to persons with a criminal history category of V and a total offense level of 27, namely a range of 120 to 150 months.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| ✓ | No notices required. | |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |
| OR | courtroom deputy's initials | |

number of notices

FEB 21 2003

date docketed

docketing deputy initials

date mailed notice

mailing deputy initials

**Document Number**

33

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                                     )

             **Plaintiff,**       )
                                     )

      vs.                       )       **Case No. 01 CR 1157**
                                     )

SHEILA MATTHEWS,             )
                                     )

             **Defendant.**      )

## MEMORANDUM OPINION AND ORDER

DOCKETED
FEB 21 2003

MATTHEW F. KENNELLY, District Judge:

This is, thankfully, an unusual case. Defendant Sheila Matthews pled guilty to kidnapping a sixteen month-old child ("Girl A") on December 24, 2001, in violation of 18 U.S.C. §1201(a). Matthews' boyfriend Dewallis Harris had recently been released from a California prison. While Harris was imprisoned Matthews falsely told him that she had given birth to a daughter whom he had fathered, and she sent him a photograph purporting to be that of the child. Matthews said she had named the girl after Harris's mother and grandmother. In September 2001, after Harris's release and return to his home in the Chicago area, Matthews contacted him from West Virginia, where she said she was living with their daughter. Harris traveled to West Virginia to see the child, but was told by Matthews that the girl was in Florida with Matthews' mother. Matthews had displayed in her home the same photograph that she had sent to Harris in prison, in a frame with the inscription "Daddy's Little Girl." Harris returned to the Chicago area.

On December 17, 2001, Matthews went to a Kentucky town just across the border from

33

her home and applied for welfare benefits for herself and a child with the same name she had reported to Harris. She supplied an uncertified and obviously false birth certificate and was told that she would have to provide the original or a certified copy as well as a Social Security card for the child. She returned to West Virginia, where she attempted to apply for a Social Security card using the same phony birth certificate. She was again told that an original or certified copy was required. Matthews did not return to either office.

Matthews came to Chicago on December 24, 2001 to visit Harris and his mother and family. She told them that her mother would be bringing their daughter to Chicago that evening via Greyhound bus. On Christmas eve, Harris' mother drove Matthews to the Chicago Greyhound bus station and waited outside in her car; Matthews went inside, where she said her mother's bus was expected to arrive soon.

Inside the station, which was quite crowded due to heavy holiday travel, Matthews – presumably after casing the entire joint – saw Girl A's mother Marcella Anderson, who was in the station with her two daughters, Girl A, who was sixteen months old, and her four year old sister. They had traveled from St. Louis by air and planned to take a bus to Milwaukee. Anderson, who was hauling several bags, was worn out from the travel and from trying to deal with two tired and cranky young children. While Anderson she waited in a long line to purchase tickets, Matthews approached her, complimented her on Girl A, and asked the child's name and age. Matthews then left and later returned after Anderson had purchased tickets; in the meantime she had exited the station and told Harris' mother, who was waiting in the car, that her (Matthews') mother's bus was running late.

Matthews returned to Anderson, introduced herself as "Christine," and engaged her in

2

conversation. She asked Anderson where she was going, and when she said Milwaukee, Matthews said that it was too bad she had not known that earlier, as she planned to drive there herself after her college-age daughter's bus arrived, and could have given Anderson and her children a ride. A few minutes later, she offered Anderson a ride to Milwaukee, and after some initial reluctance, Anderson accepted, hoping to ease the burden of travel. Anderson got in line to cash in her bus ticket. Matthews said she would hold Girl A, and Anderson handed the child to her. After a minute or two, Matthews said that she had spotted her own daughter, and started to walk off with Girl A. Anderson asked Matthews to leave the girl with her, but Matthews said "don't worry," and Anderson turned back to the ticket window to sign the receipt necessary to cash in her ticket. By the time she looked again, Matthews and Girl A were disappearing around a corner. Anderson and an unidentified man who had helped her with her luggage attempted to give chase, but they lost sight of Matthews and the child because the station was so crowded.

Matthews took the child outside, where Harris' mother was still waiting in the car. Matthews had been inside the station only 15 minutes since returning to tell Harris's mother about the delay in the arrival of the bus. She approached the car running and carrying the child and told Harris' mother they had to hurry up and leave because Matthews' husband was following her. They returned to the mother's house and had Christmas dinner the next day with Harris' relatives.

Around 7 p.m. on December 26, Matthews, Harris, and Girl A began a 12-hour drive to West Virginia. They stopped only once. Early the next morning, while it was still dark and they were one hour from their destination, they had an accident after sliding on ice, and Girl A appears to have sustained a small cut on her forehead. Their car was towed, and Matthews' sister

3

picked them up and took them to Matthews' home in West Virginia.

In the meantime, Harris' mother – who had been suspicious because Girl A did not look like the photo she had seen of Matthews' purported daughter – learned from a friend of media reports about the kidnapping of a small child from the Chicago Greyhound station. After seeing on television a picture of the child and Matthews, who evidently had been identified from mug books, she went to the police and provided them with information about where Matthews and Boyfriend A were traveling. Girl A was recovered by FBI agents and local West Virginia police on December 27, 2001, and she was returned to her mother the following day. Aside from the apparent cut on her forehead and an ear infection and accompanying fever, she was in good health.

Matthews pled guilty "blind" (i.e., without a plea agreement) on May 31, 2002. In connection with her guilty plea, Matthews submitted a written declaration in which she admitted her guilt and described, in general terms, how she had kidnapped Girl A. Prior to sentencing, she submitted to the Probation Office for transmission to the Court a written statement in which she stated as follows:

> I realy cant exsplain why I did it. I have never been the one to hurt anybody, physically or meantally. I do hate myself for what I did. I have flash backs and it realy hurts me in my heart. I cry at times knowing I hurt sombody meantally. I wish I could turn back times I would have never did what I did.
>
> I know that I was very wrong, but Im asking for another chance to prove that I'm not a life times criminal. I do have good points about myself. By me doing what I did I lost a lot, my pride, self asteam, and im trying very hard not to loose full respect for myself. And I know that I have lost respect from others but I would very much like to prove myself to the Community cause I know how people feel about me, and I was realy wrong and I send my remorce and heart out to the family and let them know that I am very sorry. Please try to find it in there heart to except my apoligey.

4

My God is helping me through this. I know I have a lot to do. I practice more of my religion. Go to AA/NA and I have also finished some class's. Now I know I must grow up and stay away from evil.

When I do get out I want to re open my bussiness go to college, counsleing, AA/NA and make a better life for my children and myself.

I realy hope you'all find it in your hearts to give me some hope that I'll have the chance to live a better life.

Thank You
Sheila Matthews

On September 26, 27, and 30, 2002, the Court held an evidentiary hearing regarding various disputed Sentencing Guidelines issues and the government's request for an upward departure on various grounds. The remainder of this Memorandum Opinion will address those issues.

## 1. Offense level issues

It is undisputed that the base offense level under U.S.S.G. §2A4.1 is 24. There are three disputed issues concerning proposed adjustments to the offense level.

### a. U.S.S.G. §2A4.1(b)(6)

The government argues that Matthews placed Girl A, a minor, in the "care or custody of another person who does not have a legal right to such care or custody of the child either in exchange for money or other consideration," thus warranting a three-level increase. *See* U.S.S.G. §2A4.1(b)(6). It relies upon evidence that others (primarily Harris' mother) watched Girl A for brief periods while she smoked cigarettes and performed other personal tasks at the mother's house, and it claims that Harris "was entrusted with driving the vehicle while on route to West Virginia." Govt. Mem. at 20. The government cites no authority supporting application of the increase under similar circumstances. Matthews never relinquished care or custody of Girl A to

anyone; the fact that someone else may have watched her for a few minutes does not, in the Court's view, constitute "plac[ing] [her] in the care or custody of another person," and certainly not in the way likely contemplated by the Sentencing Commission when it drafted this aspect of §2A4.1. More importantly, no "money or other consideration" was provided by or to Matthews for these brief intervals; the government's reliance on a claim that she was hoping to continue her relationship with Harris does not suffice, and in any event was not something expected specifically in return for Harris' mother watching the child for a few minutes. Finally, Girl A was in Matthews' care and custody at all times during the drive to West Virginia; there is no reason to believe that the enhancement should apply whenever a defendant who has kidnapped someone takes a form of transportation in which someone else is at the controls. The government has failed to provide evidence sufficient to establish that the adjustment should be made.

**2. U.S.S.G. §3A1.1(b)(1)**

The government argues that the Court should increase the offense level by two levels on the grounds that "the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. §3A1.1(b)(1). A vulnerable victim is one who is "unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to criminal conduct." *Id.*, App. Note 2. This increase does not apply "if the offense guideline specifically incorporates" the factor that makes the victim vulnerable. *Id.* Thus, "if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied *unless the victim was unusually vulnerable for reasons unrelated to age." Id.* (emphasis added); *see United States v. Romero,* 189 F.3d 576, 590 (7th Cir. 1999).

The kidnapping statute provides for a "special rule" in sentencing persons convicted of kidnapping an unrelated child under age 18. 18 U.S.C. §1201(g). That "special rule" directed the Sentencing Commission to include enhancements by including a number of specific offense characteristics providing for enhancements, including the "care and custody of another person" enhancement in U.S.S.G. §2A4.1(b)(6). 18 U.S.C. §1201(g)(2). But nothing in the offense guideline for kidnapping offenses incorporates an enhancement based specifically on age; the only age-related offense characteristic is the "care and custody" enhancement that the Court has already held does not apply. For these reasons, there is no bar to imposition of the vulnerable victim enhancement. Because Girl A was "unusually vulnerable" based on her age, the Court rules that the two-level enhancement applies.

### 3.    U.S.S.G. §3E1.1

The government opposes giving Matthews credit for "acceptance of responsibility" under Guideline §3E1.1. To qualify for the downward adjustment for acceptance of responsibility, Matthews must demonstrate that she "clearly recognizes and affirmatively accepts responsibility for [her] offense," U.S.S.G. §3E1.1(a), must timely notify the authorities of her intention to plead guilty, and must truthfully admit the conduct comprising the offense of conviction and not falsely or frivolously contest any relevant conduct as it relates to the offense of conviction. *See, e.g., United States v. Frykholm,* 267 F.3d 604, 610 (7th Cir. 2002). There is no dispute that Matthews has satisfied the second and third elements of this test; her guilty plea was made before the case had been set for trial, and in that plea Matthews truthfully admitted the conduct underlying the kidnapping. The dispute concerns the first element. The government says that in the previously-quoted statement that Matthews submitted to Probation, she falsely denied that she had

physically or mentally hurt anyone. It also relies on statements made by Matthews in tape recorded conversations that took place in March, April, and May 2002, while she was detained at the Chicago Metropolitan Correctional Center. In those conversations, which were introduced at the sentencing hearing, Matthews twice falsely stated that Harris solicited her to kidnap Girl A, and she repeatedly, and falsely, told various persons that she was pregnant and that she had a daughter the approximate age of Girl A. Matthews evidently continues to maintain this charade; just before the sentencing hearing she requested, and the MCC scheduled on her behalf, a pelvic ultrasound examination – a test that is commonly performed on pregnant women.

The Guidelines provide that "[e]ntry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which [she] is accountable ... will constitute significant evidence of acceptance of responsibility." U.S.S.G. §3E1.1, App. Note 3. Though this plainly is the case here, the Guidelines provide that such evidence "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." *Id.*

Matthews' entry of a plea of guilty, by itself, is not sufficient to establish her acceptance of responsibility. *United States v. McIntosh*, 198 F.3d 995, 999 (7th Cir. 2000). But Matthews has done more than simply plead guilty; she truthfully described in her plea declaration the conduct that constituted the offense; she has not denied any of the relevant conduct asserted by the government (specifically her attempt to fraudulently obtain government benefits); and she penned a statement – on its face plainly drafted by her, not her lawyers – expressing remorse and apologizing to Girl A's family for her actions. Finally, the Court has observed Matthews during

the presentation of evidence at the sentencing hearing. Her demeanor, which does not appear to the Court to be feigned, has been consistent with the shame expressed in her written submission and

Matthews' two statements falsely accusing Harris were not made to the Court, Probation, or any law enforcement official; there is no evidence that she said anything like that to anyone other than her sister and the mother of a man she had met in prison. The FBI case agent testified that she examined the tapes of each and every one of Matthews' telephone conversations through September 6, 2002, some 300 conversations altogether; no other similar statements surfaced. Significantly, the statements were made on April 10 and May 10, 2002, before Matthews' guilty plea and before her preparation of the written statement quoted earlier. There is no evidence that Matthews has at any time since her plea accused anyone of participating in or soliciting the kidnapping. The Seventh Circuit has recognized that credit for acceptance of responsibility may be appropriate even if, at some earlier time, the defendant did or said something inconsistent with acceptance of responsibility. *United States v. Anderson,* 259 F.3d 853, 862 (7th Cir. 2001); *United States v. Lallemand,* 989 F.2d 936, 938 (7th Cir. 1993). Matthews' isolated earlier statements, which in themselves are not necessarily indicative of anything other than an attempt to generate sympathy from a relative and the mother of a male friend, are insufficient to undercut the previously-described evidence which strongly supports a finding that she has clearly accepted responsibility.

In the Court's view, Matthews' false claims of pregnancy since incarceration and her false reports – all prior to her entry of a guilty plea – of having a child the approximate age of Girl A, have little to do with whether she has accepted responsibility. Though the Court is in no

9

position to determine what motivated Matthews to make these claims, it is entirely possible –
indeed it is likely – that they are simply delusional and/or the product of a psychiatric disorder.
Those statements are not indicative of a lack of acceptance of responsibility.

Finally, Matthews' comment in her written statement to Probation that "I have never been
the one to hurt anybody" does not reflect a failure to accept responsibility; that statement was
followed by an unequivocal acknowledgment that she had, in fact hurt the victims in this case.

For these reasons, the Court determines that Matthews has clearly shown that she has
accepted responsibility and that she is therefore entitled to a two-level credit for acceptance of
responsibility under U.S.S.G. §3E1.1(a). Because she "timely notif[ied] authorities of [her]
intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial
and permitting the court to allocate its resources efficiently," *id.* §3E1.1(b), she is entitled to an
additional one-level credit.

### d.    Conclusion

The adjusted offense level for the offense of conviction is 26. It is undisputed that the
adjusted offense level for the relevant-conduct offense of false statements under 18 U.S.C. §1001
is 6. The combined adjusted offense level pursuant to U.S.S.G. §3D1.4 is 26. After adjustment
for acceptance of responsibility, the total offense level is 23. It is undisputed that Matthews'
criminal history category, prior to consideration of the government's motion for upward
departure pursuant to U.S.S.G. §4A1.3, is II. As a result, the sentencing range, prior to
consideration of the government's departure motions, is 51 to 63 months.

## 2.    Departure issues

The Court is required to impose a sentence within the guideline range "unless the court

finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. §3553(b). The Court is to "treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." U.S.S.G., ch. 1, pt. A, intro. comment 4(b). Departures from the range prescribed by the Guidelines are proper "only in cases that involve factors for which the guidelines do not adequately account, either because not considered at all or because the factor is present in an exceptional way." *United States v. Otis,* 107 F.3d 487, 490 (7th Cir.1997). If the particular factor relied upon for a departure is one as to which the Guidelines encourage departures, a court may rely on that factor to depart "if the applicable Guideline does not already take it into account." *Koon v. United States,* 518 U.S. 81, 96 (1996). If the encouraged factor is taken into account by the applicable Guideline, the court may depart "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Id.* If the factor is not mentioned in the Guidelines, the court must, "after considering the structure and theory of both relevant guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland." *Id.* (internal quotation omitted).

The government has moved for an upward departure on three grounds. It contends that Girl A sustained a "significant physical injury" warranting a departure under Guideline §5K2.2; that Matthews engaged in "extreme conduct" meriting a departure under Guideline §5K2.8, and that her criminal history category does not adequately reflect the seriousness of her criminal conduct or the likelihood she will commit other crimes, warranting a departure under Guideline

§4A1.3. On the final day of the sentencing hearing, the Court advised the parties that it was considering an upward departure under Guideline §5K2.0 on the grounds that Matthews' offense is outside of the heartland of the criminal conduct covered by Guideline 2A4.1; Matthews was given the opportunity for a continuance but did not request one.

### a.    U.S.S.G. §5K2.2 - "significant injury"

Guideline §5K2.2 provides that "[i]f significant injury resulted, the court may increase the sentence above the authorized guideline range." U.S.S.G. §5K2.2. Girl A was admitted to a hospital after she was recovered by the authorities; this, however, appears to have been a routine step for a kidnapping victim and not by itself an indication that she suffered injury, let alone significant injury. There is evidence that Girl A had an ear infection and a fever, which it is reasonable to infer was a result of the ear infection. Marcella Anderson testified that Girl A did not have a fever or an ear infection prior to the kidnapping. But that does not mean that these conditions "resulted" from the offense, or even that they arose during the abduction. It is just as likely that Girl A had contracted the infection before the kidnapping but had not yet manifested any signs or symptoms. The only competent evidence presented to the Court on that score is an affidavit from the physician who examined and treated Girl A in the hospital following her recovery; he states that there is no way to determine whether the infection arose before or after the kidnapping. Moreover, this type of ordinary childhood illness can hardly be considered "a significant injury" for purposes of §5K2.2, particularly without evidence that it lasted for an unusually long period, was unusually serious, or was aggravated by lack of treatment during the time that Matthews had Girl A.

Girl A also appears to have sustained a small cut (about one-half inch long) on her

forehead as a result of the automobile collision that took place before Matthews and Harris reached West Virginia. The evidence on this score is somewhat equivocal; the physician who examined Girl A in West Virginia does not appear to have observed a cut, though Anderson testified credibly that Girl A had one. Either way, however, this small cut, which apparently healed without complications or scarring, is not a "significant" injury of the type that brings §5K2.2 into play.

Finally, the guideline that covers kidnapping cases specifically provides for an increase in the offense level in the event of a "serious" bodily injury. *See* U.S.S.G. §2A4.1(b)(2)(B). It is questionable whether §5K2.2 permits an upward departure in a case in which the Sentencing Commission plainly took the issue of bodily injury into account in drafting the guideline applicable to the offense. The Guidelines provide that when the applicable offense guideline and adjustments take into consideration an "encouraged" departure factor, a departure is warranted "only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense." U.S.S.G. §5K2.0; *see Koon,* 518 U.S. at 96. Girl A's injuries and ailments do not bring the factor of physical injury into play in a way that even approaches, let alone substantially exceeds, the type of "serious bodily injury" that the Sentencing Commission believed necessary to warrant an upward adjustment under §2A4.1(b)(2)(B). Though it is possible to depart even when the reason for departure is taken into consideration in determining the guideline range "if the court determines that, in light of unusual circumstances, the weight attached to that factor under the guidelines is inadequate or excessive," U.S.S.G. §5K2.0; *see, e.g., United States v. Scott,* 914 F.2d 959, 963 n.5 (7th Cir. 1990), that is not the case here. The Court's conclusion that this type of departure is not appropriate in kidnapping cases is not,

however, necessary to our decision, for as discussed above we have concluded that the evidence fails to support a departure on this basis even if the Guidelines would permit one.

### b. U.S.S.G. §5K2.8 - "extreme conduct"

Guideline §5K2.8 provides that "[i]f the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct." U.S.S.G. §5K2.8. All kidnappings, by their very nature, involve conduct that is heinous (reprehensible) and cruel (involving willful causation of pain or distress to another).[1] Those factors are, however, taken into account in the base offense level for the offense of kidnapping and certain of the adjustments that apply under that Guideline. The issue for purposes of the government's departure motion is whether, in the terms of §5K2.8, the conduct was *unusually* reprehensible and cruel.

What happened in this case, though it was reprehensible and cruel to both Girl A and her mother, does not approach the types of conduct cited in §5K2.8 as examples of what constitutes "extreme conduct": "torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation." Indeed, all but one of the cases cited by the government in which a §5K2.8 departure was approved all involved the infliction of extraordinary physical violence or unusually malicious psychological mistreatment, neither of which took place in this case. *See United States v. Matchopatow,* 259 F.3d 847, 850 (7th Cir. 2001) (second degree murder; a "stomach retching" crime in which the defendant used an accelerant to char the victim's face and torso to the bone); *United States v. Seawood,* 172 F.3d 986, 990 (7th Cir. 1999) (carjacking offense which included

---

[1] This case does not appear to involve "brutality" -- which implies an element of violence or savagery – or "degrading" conduct, at least not beyond what is inherent in all kidnappings.

repeated sexual assaults of female victim and confining male victim in car trunk); *United States v. Bailey,* 97 F.3d 982, 984 n.1 (7th Cir. 1996) ("unusually degrading conduct"); *United States v. Herrera,* 70 F.3d 444, 447 (7th Cir. 1995) (narcotics offense and retaliation against witness, who was beaten, hit with a hammer, stabbed, and had her throat cut).

The only case cited by the government that does not fit this mold is *United States v. Patrick,* 935 F.2d 758 (6th Cir. 1991), a kidnapping case that bears some similarities to the present case. The Court reads *Patrick,* however, as a case approving an upward departure on more general grounds – that the offense was "outside the heartland" of what is contemplated in Guideline §2A4.1, thus warranting a departure under Guideline §5K2.0. The Court will address that point more fully in the following section of this Memorandum Opinion.

Matthews' conduct was certainly unusual and bizarre – factors that we take into account in the following section of this Memorandum – but the Court is not able to find that it was "unusually" heinous or cruel beyond what occurs in kidnappings generally. In some ways Matthews' taking of Girl A was arguably more serious than a kidnapping for ransom – the absence of contact with the victim's family left them completely in the dark – and in some ways it was arguably less serious – there was no express or implied threat of harm to the victim as is common in kidnappings for ransom. On balance, though Matthews' crime was heinous and cruel, the government has failed to establish that it was *unusually* so, as required to invoke §5K2.8.

Finally, the Court is not persuaded that Matthews withheld food or medical treatment from Girl A during the trip to West Virginia. There is no evidence that Girl A was actually suffering from symptoms of the ear infection during the trip. The drive took place overnight, and

15

it is likely that Girl A slept for most of the trip; there is no credible evidence that she was awake or crying in hunger or pain. As noted in defendant's sentencing submission, it defies credulity to believe that Harris (not to mention Matthews) would have chosen to listen to a sixteen-month old child crying during any appreciable part of that lengthy drive. Girl A was fed regularly when she was with Matthews at the home of Harris' mother; there is no basis to believe that Matthews would have refused to feed her during the drive to West Virginia.

### c. U.S.S.G. §5K2.0 - conduct outside "heartland" of kidnapping guideline

Guideline §5K2.0 provides that a court "may impose a sentence outside the range established by the applicable guidelines, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" U.S.S.G. §5K2.0 (quoting 18 U.S.C. §3553(b)). Before making such a departure, the Court must find that "certain aspects of the case [are] unusual enough for it to fall outside the heartland of cases in the Guideline." *Koon v. United States,* 518 U.S. 81, 98 (1996).

The Sentencing Guideline provision that applies to kidnapping describes what the Sentencing Commission considered to be the "heartland" of kidnapping cases: "[f]ederal kidnapping cases generally encompass three categories of conduct: limited duration kidnapping where the victim is released unharmed; kidnapping that occurs as part of or to facilitate the commission of another offense (often, sexual assault); and kidnapping for ransom or political demand." U.S.S.G. §2A4.1, Application Notes. The present case falls outside each of these categories. As in *United States v. Patrick,* 935 F.2d 758 (6th Cir. 1991), a case in which an apparently deranged defendant became obsessed with a friend's three year old daughter and

16

kidnapped her, planning to keep her and eventually marry her when she was old enough, Matthews' conduct "does not fit into any of these general kidnapping categories: [her] ... purpose in kidnapping [Girl A] was to possess her and keep her from her parents for her entire life." *Id.* at 761. Contrary to Matthews' argument, this was not a "limited duration kidnapping where the victim is released unharmed": Girl A was not released; she was liberated by law enforcement.

This case was unusual, and outside the heartland of kidnapping cases covered by Guideline §2A4.1, because the kidnapper took the child not to achieve some sort of secondary end – ransom, sexual gratification, or satisfaction of other demands – but rather to make the victim part of her family permanently. The FBI's primary case agent, Lynette Doorley, credibly testified that "stranger abductions" of children (i.e., those not involving family members or ransom) are rare, and it is fair to infer that stranger abductions in which the stranger intends to make the child part of her own family are even rarer.

The Court concludes that this aspect of the case is an aggravating factor not taken into account in the Guidelines. It is an aggravating factor because, among other reasons, the very nature of the offense – the absence of a demand to the victim or the authorities and the fact that the victim is a small child unable to fend for herself – makes detection more difficult. It is likewise an aggravating factor because, like a kidnapping for ransom or for the purpose of sexual gratification, it involved premeditation and was not a spur-of-the-moment adjunct to some other offense. And there is no indication that the Sentencing Commission took this factor into account: examination of the Commission's description of the usual types of kidnappings and the specific offense characteristics identified as giving rise to upward adjustments of the offense

17

level under §2A4.1 makes that abundantly clear. The Court therefore concludes that it is appropriate in this case to depart upward on this basis. As in *Patrick*, Matthews' purpose and conduct was "indisputably rare and sufficiently aggravating to warrant departure under §5K2.0." *Patrick*, 935 F.2d at 761.

The degree of an upward departure must be based on "the policies found in the guidelines." *United States v. Newman*, 965 F.2d 206, 213 (7th Cir. 1992). The Seventh Circuit has stated that "[t]he best way to find the right amount of departure is to work through the treatment of analogous offenses." *United States v. Herrera*, 70 F.3d 444, 447 (7th Cir. 1995). As previously discussed, Guideline §2A4.1 established a three-level enhancement for kidnapping a minor if, "in exchange for money or other consideration, [the victim] was placed in the care or custody of another person who had no legal right to such care or custody of the victim." U.S.S.G. §2A4.1(b)(6). The Commission, rightly or wrongly, appears to have treated kidnappings in which a child is given over to someone other than its parent as less severe than kidnappings for ransom. *See id.* §2A4.1(b)(1) (six-level enhancement if ransom is demanded). The Court finds that the aggravating circumstances that warrant a §5K2.0 departure in this case are roughly equivalent to those in the "care or custody"-type offense described in Guideline §2A4.1(b)(6). There is, however, one aggravating factor that counsels in favor of an upward adjustment slightly higher than that described in the offense guideline. Matthews' efforts to set up her offense – by attempting to set up a false identity for her kidnap victim and making false applications in an effort to pave the way to achieve her nefarious goal – significantly exceed the normal degree of premeditation that accompanies an ordinary "kidnapping for hire" of the type covered by §2A4.1(b)(6). Considering all of these circumstances, the Court will depart upward

18

by four levels.

### d.    U.S.S.G. §4A1.3 - under-representative criminal history category

Guideline §4A1.3 provides that the court may depart from the otherwise applicable guideline range "[i]f reliable information indicates that the [defendant's] criminal history category does not adequately reflect the seriousness of the defendant's [past] criminal conduct or the likelihood that the defendant will commit future crimes." U.S.S.G. §4A1.3. To determine whether a departure under that provision is appropriate in this case, we must first examine Matthews' prior offenses.

#### (1)    Matthews' prior offenses

In 1987, when she was 18 years old, Matthews pled guilty on separate occasions to three separate theft offenses on which the Court has been given no details; she received a suspended sentence in one case and jail sentences of 10 days and 15 days in the other two. Also in 1987, she pled guilty to forging an endorsement on a tax refund check and received a sentence of 40 days in jail and one year of supervision; in 1989 and 1992, she was sentenced to jail terms of 20 days and 30 days based on various violations of the conditions of supervision. Matthews also pled guilty in 1987 to driving without a valid license and giving false information to a police officer, receiving a suspended jail sentence and a fine. None of these offenses resulted in any criminal history points for Matthews in the present case due to the fact that they were committed over ten years before the current offense. *See* U.S.S.G. §4A1.2(e)(2).

In February 1988, when she was 19, Matthews pled guilty to unlawful imprisonment and was sentenced to five and one-half months in jail and one year of supervision. The materials presented to the Court regarding this offense reflect that in mid-November 1987, Matthews was

sitting for her young nephew, who was visiting her at her home for several days. She contacted an acquaintance and asked if his two year old child could stay at her home for a few days as a playmate for her nephew. The acquaintance agreed, and the child was left with Matthews on November 17, 1987. The child, however, stayed at Matthews' home for over three weeks, as best as we can tell without any challenge or even any further inquiry from the child's father or mother, at least not initially. Later in November, a mutual friend of Matthews and the child's parents saw Matthews with the child; Matthews said that the child was hers. The friend reported this to the child's parents. On December 10, 1987, Matthews spoke with the mutual friend, who told her that the parents were concerned about the child's whereabouts and she had to return the child. Matthews apparently falsely reported that she had already done so. She was arrested and charged with kidnapping the child from November 30 (*not* November 17) through December 17. She pled guilty to a reduced charge of unlawful imprisonment and was sentenced as noted earlier. In 1989 and 1992, she received short jail sentences for violating the conditions of her supervision. Matthews received no criminal history points in the present case for that conviction due to the fact that her jail sentence was less than one year and was imposed more than ten years before the kidnapping of Girl A. U.S.S.G. §4A1.2(e)(2).

In April 2001, at age 32, Matthews pled guilty in the State of Washington to attempted forgery arising from an offense that had taken place in 1988. Matthews was charged with the offense in 1989 but evidently was considered a fugitive due to her absence from Washington until 2001, when she was arrested. The offense concerned Matthews' forging of endorsements on at least two checks. Matthews received a jail sentence of 99 days, of which 77 were suspended, plus one year of supervision. Matthews received one criminal history point for this

conviction in the present case even though the offense was an old one, as the Guidelines look to when the sentence was imposed, not when the offense was committed. *See* U.S.S.G. §4A1.2(e). She also received two additional points because the present kidnapping offense took place while she was under court supervision resulting from the forgery case. *See* U.S.S.G. §4A1.1(d).

There is one additional episode that did not result in criminal charges or a conviction but is nonetheless quite significant to the government's request for an upward departure. In the year 2000, Matthews was living in the Chicago area and was either living with or married to a man named Arthur Brown. She had become friends with Arthur Brown's niece, Kim Brown, then 18 or 19 years old with three young children. Kim Brown ("Brown") testified at the sentencing hearing in this case. She stated that Matthews had talked about moving back to the Seattle area, where she had previously lived, and Brown was considering moving to that area as well. By the fall of 2000, both Matthews and Brown had decided to move to Seattle and planned to travel there by bus. Though Brown was able to afford bus tickets for herself and her children, she and Matthews made an agreement for Matthews to travel there first, along with Brown's children, with Matthews paying for the children's tickets. Matthews may well have had the ultimate scenario in mind when she went to Seattle with Brown's children. However, Brown did not claim that Matthews had convinced her to do this or had tricked her in any way; she evidently was entirely willing to, and comfortable with, sending her children to Seattle with Matthews. In late November 2000, Matthews ended up traveling to Seattle with two of the children, both of whom were under five years old.

Brown testified that she originally planned to travel to Seattle with her third child in late December but later decided to delay her departure for undisclosed reasons. She had occasional

21

telephone conversations with Matthews, who repeated that the children were fine. Brown evidently never had any concerns about the children's well-being.

At some point in January 2001, Matthews' own daughter, who was 16 years old and still living in the Chicago area, called the FBI and reported that she believed her mother had taken two children to Seattle and that she was afraid for the children's safety. The FBI agents interviewed Matthews' daughter, who reported that Matthews was living at a Seattle shelter. The agents contacted local Seattle authorities. They learned that there was an outstanding Washington warrant for Matthews from 1988, located Matthews in Seattle, and arrested her on that warrant. At her home, the agents found the older of Kim Brown's children (a four year old boy), who said that his name was "Carmichael Eldridge Buchanan" and that Matthews was his mother. When interviewed, Matthews falsely told the agents that she was the biological mother of the boy and denied any knowledge of the location of Brown's younger child. Later in the interview, Matthews changed her story, saying that she was not the biological mother but had a letter from the boy's mother permitting her to have him, though she said the letter had been stolen. When leaving the home under arrest, Matthews asked the boy to "give Mommy a kiss." A male friend of Matthews' who was at the home at the time of the arrest reported that he had recently been released from prison and that Matthews had told him that the boy was their son, though he had doubted this. Through further investigation, the agents discovered an immunization record for Brown's son identifying him as "Carmichael Eldridge Buchanan."

Matthews had left Brown's eleven month old daughter with a friend in Moses Lake, Washington, a small town approximately three to four hours from Seattle. The friend, a woman in her thirties, was aware of Matthews' earlier conviction for keeping another person's child as

her own and testified at the sentencing hearing that at the time she had been was concerned about whether the girl was actually Matthews' child. Despite this, she kept the girl at Matthews' request for an extended period without reporting her concerns to the authorities or anyone else. Eventually she contacted Matthews in Seattle and had a mutual friend take the girl there. It is not entirely clear to the Court how or when the girl was recovered.

FBI Agent Bruce Bennett, one of the agents who investigated this episode, reported that Matthews stated that she had applied for government benefits for both children. However, government did not introduce, and thus presumably has not located, any such application. It likewise did not identify the type of benefits for Matthews supposedly applied. Matthews had a Social Security card in the daughter's name, but the Court has not been given evidence sufficient to find that Matthews applied for it.

Brown obviously knew that her children were with Matthews in Washington for an extended period but had made no complaints or reports to the authorities. She was unaware, however, that Matthews had tried to change her son's name or had described the children as her own until she learned this from the authorities. Matthews was not charged with any offenses arising from this incident, presumably because Brown had voluntarily permitted the two children to travel with Matthews.

### (2) Discussion

We discuss first the 1987 and 2000 incidents involving Matthews' keeping of children belonging to others and misrepresenting them as her own.

Before a court can depart upward under Guideline §4A1.3, it must identify the factors in the defendant's history that the guidelines did not take into account and that form the basis for

the departure. *E.g., United States v. Angle,* 234 F.3d 326, 344 (7th Cir. 2000) The court must also explain "why those factors make the defendant's criminal history comparable to criminal histories found in a higher category than to those found in the defendant's category." *Id.* (quoting *United States v. Tai,* 994 F.2d 1204, 1214 (7th Cir. 1993)).

Matthews argues that the 1988 unlawful imprisonment conviction should not be considered because the Guidelines do not count convictions involving sentences of less than one year imposed more than ten years before the commencement of the offense of conviction. U.S.S.G. §4A1.2(e). The law is clear, however, that if "a sentence imposed outside this time period is evidence of similar, or serious dissimilar, criminal conduct," the court may consider it in determining whether to depart upward under §4A1.3. *United States v. Footman,* 215 F.3d 145, 156 (1st Cir. 2000) (quoting U.S.S.G. §4A1.2, App. Note 8); *United States v. Delmarle,* 99 F.3d 80, 85 (2d Cir. 1996). *See United States v. Cross,* 289 F.3d 476, 478 (7th Cir. 2002).

Matthews argues that several factors counsel against consideration of the 1987 incident. She claims that the father of the child was her pimp, and she points out that it is unclear whether or when he and the child's mother complained about Matthews keeping the child, noting that the presentence report in Matthews' case suggests that they themselves were considered suspects. But Matthews pled guilty to a crime, and there is no indication that there is any proper basis for her to collaterally attack the conviction. Under the circumstances, the factors cited by Matthews affect only the weight to be given to the 1987 offense, not whether it is properly considered.

On the other hand, consideration of the 2000 episode involving the Brown children for purposes of a §4A1.3 departure is arguably problematic, as Matthews was not charged with an offense under federal or state law. The Seventh Circuit appears to have limited the type of

24

conduct that can be considered as grounds for an upward departure under §4A1.3 to *criminal conduct* – though it permits consideration of criminal conduct even if it did not result in a conviction. *See, e.g., United States v. Klund,* 37 F.3d 1249, 1252 (7th Cir. 1994); *United States v. Short,* 4 F.3d 475, 479-80 (7th Cir. 1993). *See also United States v. Turchen,* 187 F.3d 735, 742 (7th Cir. 1999) (approving consideration of offense of which defendant was acquitted by reason of insanity). The court has held that "the district court must make an independent determination that a preponderance of the evidence indicates that the defendant committed the crime." *Short,* 4 F.3d at 480. The government has cited no authority for the proposition that conduct that was not criminal at all may be considered under §4A1.3.

We turn, therefore, to the evidence concerning the 2000 episode involving the Brown children to assess whether Matthews committed a crime. The government contends that Matthews made a false application for public assistance for the Brown children. The Court, however, is hesitant to conclude that this has been established by a preponderance of the evidence in view of the government's failure to offer any evidence of this other than Matthews' own statement. The same is true of the Social Security card for Brown's daughter that was in Matthews' possession; there is no direct evidence, and no convincing circumstantial evidence, that Matthews was the one to procure the card. Finally, the government argues that Matthews committed the offense of criminal impersonation in violation of Washington law, pointing to her possession of five Washington state identification cards, each with a different name, and at least two of which were current and unexpired as of 2000. But that offense appears to require not just assumption of a false identity, but also performance of an act using the false identity with the intent to defraud or for an unlawful purpose. *See* Wash. St. 9A.60.040(1)(a). The government

25

has introduced no evidence of such conduct by Matthews.

There is persuasive evidence that Matthews made false statements to the FBI; the government argues that this was a crime under 18 U.S.C. §1001. Based on the agents' testimony, however, Matthews appears to have corrected within the interview her initially false statement that she was the natural mother of Brown's son. Though she also appears to have given a false statement that she had written permission from the boy's mother to have the child, it is unclear whether this statement was material as required under §1001, as Matthews in fact did have Brown's permission, albeit only verbally, to bring the boy to Seattle and take care of him while awaiting Brown's arrival. Under the circumstances the Court cannot rely on the false statements to the agents for purposes of §4A1.3.

The Court concludes, however, that a preponderance of the evidence in fact establishes that Matthews committed an offense in keeping the Brown children and calling them her own. Under Washington law, a person commits second degree kidnapping when she "intentionally abducts another person." Wash St. 9A.40.030(1). The term "abduct" is defined to include "restrain[ing] a person by ... secreting or holding him in a place where he is not likely to be found," *id.* 9A.40.010(2) – which, the Court finds, is what Matthews did when she left Brown's younger child with her friend in Moses Lake.[2] Alternatively, Matthews committed the offense of

---

[2] The term "restraint" is defined to mean "restrict[ing] a person's movements without consent and without legal authority in a manner which interferes substantially with his liberty. Restraint is 'without consent' if it is accomplished by (a) physical force, intimidation, or deception, or (b) any means including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person and if the parent, guardian, or other person or institution having lawful control or custody of him has not acquiesced." Wash. St. 9A.40.010(1). The Court finds that the younger Brown child was "restrained" under this definition when she was, without Brown's acquiescence, left with Matthews' friend in Moses Lake based on the deception that the child belonged to Matthews.

unlawful imprisonment – consisting of "knowingly restrain[ing] another person," *id.* 9A.40.040, or second degree custodial interference, which occurs when a "relative" of a child – defined as including "an ancestor, descendant, or sibling, including a relative of the same degree through marriage or adoption," *id.* 9A.40.010(3) – "takes, entices, retains, detains, or conceals the person from [the child's] parent" with the intent to deny the parent access to the child. *Id.* 9A.40.070. Matthews' conduct regarding the Brown children is not altogether different from what she did in 1987,and that conduct led to a conviction for unlawful imprisonment. In sum, there is evidence sufficient to establish that Matthews' conduct involving the Brown children constituted a crime under Washington law.

Both of these bizarre incidents have obvious differences and similarities with Matthews' kidnapping of Girl A. The primary difference is that in the 1987 and 2000 episodes, Matthews did not take the children away from their parents against their will or through trickery. On the other hand, the two earlier incidents, like the kidnapping of Girl A, revealed Matthews' willingness and intent to make other persons' children her own and to go to whatever lengths were necessary – creating false records, putting the children in the care of others, etc. – to accomplish that goal and convince others that the children were hers. In that respect, the primary difference between the earlier incidents and the kidnapping of Girl A in 2001 is that Matthews is now willing to spirit children away from people she does not know. In sum, Matthews' prior crimes involving her attempts to make other persons' children her own are similar to the present offense in that they involve "the same pattern of trickery and deceit prevalent throughout [her] criminal history." *United States v. Cross,* 289 F.3d 476, 478 (7th Cir. 2002). Prior criminal conduct need not be identical to the offense of conviction in order to be considered under

27

§4A1.3. *Delmarle,* 99 F.3d at 85.

Matthews' prior uncounted forgery offense, and, to some extent, her uncounted theft

offenses, are also significant. Matthews followed a similar pattern of deception in 2001 prior to

kidnapping Child A in order to set up a life for herself with the child, and she may have done

something similar with the Brown children in 2000. Matthews' recidivism in this regard is

properly taken into account in considering whether the Court should depart upward from her

criminal history category of II.

Matthews argues that an upward departure is inappropriate, saying that it is likely that

Matthews will receive mental health treatment while imprisoned and that it is unlikely that she

will repeat her crimes in the future. Though Matthews has offered no psychiatric evidence and

declined to discuss her past history and her prior psychiatric treatment (if she had any) with

Probation, common sense suggests that her offenses and her current and past false claims of

pregnancy may be the product of a significant personality disorder and/or a psychiatric condition.

This Court is naturally reluctant to conclude, without having heard any evidence specifically

addressing the point, that any particular person is incorrigible; prison sentences deter some

people from committing further offenses, and some offenders whose crimes result from

psychiatric conditions receive treatment that reduces or eliminates the likelihood of future

crimes. But in Matthews' case the Court cannot say that this is so. Her commission of similar

crimes over a period spanning nearly half of her life, as well as her continued efforts to deceive

her family members and her false claims of pregnancy which continue up to as recently as last

week, suggest that it is not a foregone conclusion that she will cooperate with or benefit from

treatment while in prison. Though the Court is certainly hopeful – for the sake of both Matthews

and society at large – that Matthews receives, and benefits from, treatment while in prison, there is no way to guarantee that such treatment will succeed in protecting society from Matthews following her release. She has shown herself to be intent on acquiring children through deceptive and criminal means, and to conduct whatever manipulation is necessary to accomplish that end. A criminal history category of II indeed understates not only the seriousness of his prior criminal conduct, but also the likelihood that she will commit crimes in the future.

In sum, the Court concludes, based on all of these offenses and their underlying facts, Matthews' criminal history category of II "inadequately reflects [her] true criminal past" and "inadequately reflects the probability of recidivism." *See United States v. Turchen,* 187 F.3d 735, 742 (7th Cir. 1999). Her prior offenses were serious, they appear to have escalated over time, at least when considering the current offense, and they reflect that Matthews is a recidivist whose crimes have escalated over time and who has, at least in the past, not been deterred by incarceration. She presents a far different picture from the ordinary defendant in criminal history category II.

The degree of an upward departure under §4A1.3 "should be determined by considering the higher criminal history categories and determining which category most closely resembles the criminal history of the defendant." *United States v. Scott,* 914 F.2d 959, 965 (7th Cir. 1990). After carefully considering the circumstances of Matthews' 1987 unlawful restraint conviction, her conduct with regard to the Brown children, and her prior theft and forgery offenses that were not included in her criminal history score, the Court finds that her criminal history is the equivalent of a person with a criminal history category of V. If it had been more recent, the 1987 unlawful imprisonment offense would have resulted in two additional criminal history points, *see*

29

U.S.S.G. §4A1.1(b); the four 1987 theft and forgery charges each would have resulted in one point based on the non-suspended portion of the jail sentence in each, *see id.* §4A1.1(c) & 4A1.2(b)(2); and the Brown matter is at least the equivalent of the 1987 unlawful imprisonment offense and thus in the Court's view should be assigned at least two criminal history points. These eight additional points, when added to the three that Matthews already has as a result of her 2001 forgery sentence and the fact that she committed the present offense while on court supervision, would move her from criminal history category II (which includes persons with two or three criminal history points) to category V (which includes persons with ten, eleven, or twelve points). The Court will therefore depart upward to criminal history category V.

### e. Conclusion

For the reasons described above, the government's motion for upward departure is granted in part and denied in part. The Court will sentence Matthews within the range that applies to persons with a criminal history category of V and a total offense level of 27, namely a range of 120 to 150 months.

MATTHEW F. KENNELLY
United States District Judge

Date: September 30, 2002